# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                              )
IKE PASCAL EGUDU,             )
                              )
            Plaintiff,        )
                              )
      v.                      )        Civil Action No. 12-1841 (ABJ)
                              )
DISTRICT OF COLUMBIA, *et al.*,  )
                              )
            Defendants.       )
_____)

## MEMORANDUM OPINION

In November 2012, plaintiff Ike Pascal Egudu filed the fifteen-count complaint in this case against the District of Columbia and defendant Jose Jimenez, a Metropolitan Police Department Officer.[1]  On July 24, 2013, the Court granted in part and denied in part defendants' partial motion to dismiss, or for summary judgment, thereby significantly narrowing the case. Mem. Op. & Order at 24–25 (July 24, 2013) [Dkt. # 16].  The counts that remained were Counts One and Two to the extent that they were asserted against Officer Jimenez in his personal capacity, and Counts Four, Nine, Ten, and Eleven to the extent that they were asserted against the District. *Id.* at 25.  Discovery ensued.

On April 7, 2014, defendants filed a motion for partial summary judgment, arguing that they are entitled to judgment as a matter of law on plaintiff's excessive force claim in Count One and the entirety of Counts Four, Nine, Ten, and Eleven.  Defs.' Mot. for Partial Summ. J. ("Defs.' Mot.") [Dkt. # 26]; Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. ("Defs.' Mem.")

---

[1]     The complaint originally listed Chief of the Metropolitan Police Department Cathy Lanier and the Metropolitan Police Department as defendants, but both were dismissed as parties when the Court ruled on the prior motion to dismiss.  Mem. Op. & Order at 5–6 (July 24, 2013) [Dkt. # 16].

[Dkt. # 26]; Supp. to Defs.' Mot. for Partial Summ. J. ("Defs.' Supp.") [Dkt. # 29]. Plaintiff opposed that motion on the grounds that there are genuine issues of material fact that preclude summary judgment. Pl.'s Opp. to Defs.' Mot. ("Pl.'s Opp.") [Dkt. # 30].

Because the Court finds that plaintiff did not present sufficient evidence to support municipal liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), it will grant defendants' motion for summary judgment on Count Four. The Court will also grant defendants' motion with respect to plaintiff's excessive force claim in Count One because, even accepting plaintiff's version of the facts as true, the alleged force was not so excessive that it meets the legal standard for a violation of plaintiff's constitutional rights. And finally, the Court will dismiss Counts Nine, Ten, and Eleven because it finds that the arrest report filed in connection with plaintiff's arrest did not satisfy the jurisdictional notice requirement of D.C. Code § 12-309.

## BACKGROUND

### I.    Factual Background

For purposes of the motion for summary judgment, defendants filed a statement of material facts that adopts a skeletal version of the facts alleged in the complaint.[2] Defs.' Statement of Material Facts as to which there is No Genuine Issue ("Defs.' SOF") at 3 n.1 [Dkt. # 26]. Those facts are as follows:

- On the evening of November 14, 2009, plaintiff drove into the parking lot of a 7-Eleven convenience store located in the District of Columbia. Defs.' SOF ¶ 1; Dep. of Ike Pascal Egudu ("Egudu Dep."), Mar. 10, 2014, Ex. 1 to Defs.' Mot. 7:14–18, 8:8–10, 9:5–7 [Dkt. # 26-1]; *see also* Pl.'s Statement of Material Facts as to which there are Genuine Issues of Material Dispute ("Pl.'s SOF") ¶ 1 [Dkt. # 30].

---

2    Defendants did, however, reserve the right to challenge the facts for any count that goes to trial. Defs.' Statement of Material Facts as to which there is No Genuine Issue ("Defs.' SOF") at 3 n.1 [Dkt. # 26].

- He wished to park in one of two spaces near the entrance of the store but could not because a Metropolitan Police Department ("MPD") cruiser was occupying both spaces. Defs.' SOF ¶¶ 1–2; Egudu Dep. 10:15–20.

- MPD Officer Jose Jimenez was seated inside the vehicle, so plaintiff gestured to the officer in an effort to get him to move the cruiser into one space, but Officer Jimenez did not respond. Defs.' SOF ¶¶ 2–3; Egudu Dep. 11:12–19, 12:17–21.

- Plaintiff then parked his vehicle in another spot and walked towards the convenience store. Defs.' SOF ¶ 3; Egudu Dep. 14:5–19.

- Before he entered the building, plaintiff stopped and spoke to Officer Jimenez about his unwillingness to move the police cruiser to free up one of the two spots. Defs.' SOF ¶ 3; Egudu Dep. 15:6–20.

- Plaintiff contends that once he got inside the convenience store, Officer Jimenez "spun him around and pulled him" or pushed him out of the building. Defs.' SOF ¶¶ 4–5; Egudu Dep. 23:5–14.

- Plaintiff alleges that Officer Jimenez then "slammed" him onto the hood of the police cruiser and began to "rough [plaintiff] up," which amounted to "pulling [him] and pushing [him] while [he] was on the top of the hood of the cruiser." Defs.' SOF ¶ 5; Egudu Dep. 24:17–22; *see also* Pl.'s SOF ¶ 5.

- Officer Jimenez then put handcuffs on plaintiff and placed him under arrest. Defs.' SOF ¶ 5; Egudu Dep. 25:1–5.

In response, plaintiff filed a statement of material facts as to which he believes there is a genuine dispute. *See* Pl.'s SOF. Although he identified several contested facts he believes to be pertinent to the Court's resolution of the motion, he did not object to any of the facts set forth in defendants' statement of material facts. *See id.* As a result, the Court will accept as undisputed the core facts as outlined in defendants' statement.

But the sparse statements of material facts from both parties provide little information about what occurred on the night in question, and the details filling in the gaps are disputed. Plaintiff contends that when he addressed Officer Jimenez prior to entering the 7-Eleven store, he was respectful and simply stated that being a police officer did not entitle Officer Jimenez to inconvenience other people. Egudu Dep. 15:12–16:18. But according to Officer Jimenez's

version of events, plaintiff shouted expletives at him.[3]  Dep. of Officer Jose Jimenez ("Jimenez Dep."), Mar. 10, 2014, Ex. 2 to Pl.'s Opp. 16:21–17:1, 18:5–7 [Dkt. # 30-2] ("[Mr. Egudu] was screaming and going at it, you know, f***ing police, they think they can do whatever the f*** they want.").  Officer Jimenez alleges that plaintiff's loud and boisterous behavior continued once plaintiff entered the store, and that he asked plaintiff to leave several times.  *Id.* 17:22–19:1; 21:3–22:17.  Plaintiff objects to that characterization, stating that he did not yell while inside or outside the store, and that instead, it was Officer Jimenez and Officer Marshall who came up to him, grabbed his arm, and started yelling in his face:  "[W]hat's your problem, do you have a problem."  Egudu Dep. 18:15–19:2, 20:21–21:9.  Plaintiff contends that in response, he held out his wrists to the officers and encouraged them to arrest him if he had done anything wrong, or to otherwise let him go.  *Id.* 19:4–12.  He alleges that the officers continued to yell at him, *id.* 20:16–21:1, so he placed his wrists behind his back and again told the officers to arrest him if he had done anything wrong.  *Id.* 22:8–13; *see also* Jimenez Dep. 25:18–20 (stating that at one point, plaintiff "turned around, put his hands in his back and tried to walk – and walked towards – come on, come on, let's go").

Both parties agree for purposes of the motion that, shortly thereafter, Officer Jimenez pushed or pulled plaintiff outside the store, allegedly "slammed" plaintiff onto the hood of the cruiser, and began to "rough" plaintiff up.  Defs.' SOF ¶¶ 4–5; Egudu Dep. 23:5–14, 24:17–22. Plaintiff claims that he did not say anything to the officers while he was being "roughed up."

---

3       In his deposition, Officer Jimenez stated for the first time that plaintiff hit the police cruiser before he entered the convenience store.  *See, e.g.*, Dep. of Officer Jose Jimenez ("Jimenez Dep."), Mar. 10, 2014, Ex. 2 to Pl.'s Opp. 14:6–16:20 [Dkt. # 30-2].  Plaintiff denies this allegation.  Pl.'s SOF ¶ 4.  Because this disputed fact is not material to resolving the questions of law presented in the motion for partial summary judgment, it does not present a jury question that would otherwise make summary judgment inappropriate.

Egudu Dep. 25:6–8. Officer Jimenez then placed plaintiff under arrest. Defs.' SOF ¶ 5; Egudu Dep. 25:1–5.

## II.     Procedural History

Plaintiff filed the fifteen-count complaint in this case in November 2012. *See* Compl. [Dkt. # 1]. Defendants filed a motion to dismiss part of the complaint, or for summary judgment [Dkt. # 11], which the Court granted in part and denied in part. Mem. Op. & Order. The only remaining counts are Counts One and Two against Officer Jimenez and Counts Four, Nine, Ten, and Eleven against the District. *Id.* at 24–25.

After the close of discovery, defendants filed the motion for partial summary judgment that is now ripe for resolution. Defs.' Mot.; Defs.' Mem. They argue that the District is entitled to summary judgment on Count Four because plaintiff has failed to produce competent evidence that would support municipal liability under *Monell*, Defs.' Mem. at 8–12, and they also argue that the District is entitled to summary judgment on the common law negligence claims in Counts Nine, Ten, and Eleven because plaintiff failed to provide notice to the District of his claims for unliquidated damages within the time period set by D.C. Code § 12-309. *Id.* at 12–14. Finally, defendants move for summary judgment on plaintiff's excessive force claim in Count One on the grounds that any force employed by Officer Jimenez was reasonable in light of the circumstances. *Id.* at 15–19.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

I.      **The District is entitled to summary judgment on Count Four.**

In Count Four of the complaint, plaintiff asserts that the District is liable under 42 U.S.C. § 1983 for the constitutional injuries he allegedly suffered as a result of Officer Jimenez's conduct on the night of plaintiff's arrest. Compl. ¶¶ 107–17. Defendants argue that they are entitled to summary judgment on that count because plaintiff did not produce sufficient evidence to support municipal liability under section 1983. Defs.' Mem. at 8–12.

Section 1983 of the Civil Rights Act provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. It is well-settled that local governments are "persons" for purposes of section 1983, but the Supreme Court has made clear that municipal liability may not be predicated on a *respondeat superior* theory. *Monell*, 436 U.S. at 690–91 ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."); *see also Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (noting that "while Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*"). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

As a result, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011), quoting *Monell*, 436 U.S. at 691; *accord City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.").

According to the D.C. Circuit:

> [T]here are a number of ways in which a "policy" can be set by a municipality to cause it to be liable under § 1983: the explicit setting of a policy by the government that violates the Constitution . . . ; the action of a policy maker within the government . . . ; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom" . . . ; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citations omitted); *see also Connick*, 131 S. Ct. at 1359 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.").

Here, plaintiff asserts that it would be proper to hold the District liable because the city had a custom of unconstitutional arrests for disorderly conduct in 2009. Pl.'s Opp. at 10. He also claims that municipal liability is proper under the theory that the District was deliberately indifferent to a need to adequately train, supervise, or discipline its officers to avoid the risk that there would be constitutional violations. *Id.* at 8. But the Court finds that plaintiff failed to provide competent evidence in support of those conclusory assertions, and therefore the defendants are entitled to summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways: either by "citing to particular parts of materials in the record, including depositions, documents, . . . [or] affidavits or declarations," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute").

Four alleged constitutional injuries underlie the municipal liability claim asserted in Count Four: plaintiff contends that the District's custom or deliberate indifference led to a violation of his First Amendment right to free speech; his Fourth Amendment right against unlawful search and seizure as well as the right to be free from the use of excessive force; and the Fifth Amendment due process clause. Compl. ¶¶ 110–11. But plaintiff does not offer any evidence that the District had a custom that promoted, or was deliberately indifferent towards, the use of excessive force or violations of the due process clause, *see* Pl.'s Opp., and mere allegations alone are insufficient at the summary judgment stage. Those claims therefore fail.

Plaintiff also failed to proffer sufficient evidence from which a reasonable juror could conclude that the District had a custom that promoted unlawful disorderly conduct arrests in violation of the First and Fourth Amendments.   In order to establish municipal liability based on "custom," there must be evidence that the municipality's employees engaged in a persistent or regular pattern of conduct that gave rise to the alleged constitutional violations.  *See Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (noting that "a policymaker could knowingly ignore a practice that was consistent enough to constitute custom"); *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013); *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 25–26 (D.D.C. 2011).   But aside from his conclusory allegations that such pervasive conduct occurred at the time of his arrest in 2009, *see* Compl. ¶ 111; Pl.'s Opp. at 10 (stating that the disorderly conduct statute was routinely abused in 2009), plaintiff provides little that supports his contention.  In his opposition brief, he points to the following "evidence" to demonstrate custom:

- A 2003 report from the Citizen Complaint Review Board ("CCRB") entitled *Disorderly Conduct Arrests Made by Metropolitan Police Department Officers*, which raised concerns regarding the District's disorderly conduct arrests based on data collected from 2001 to 2003.  *See* Pl.'s Opp. at 4–6.

- The 2011 opinion in *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183 (D.D.C. 2011), which found that there was sufficient evidence to support a jury verdict that held the District liable under *Monell* for the alleged constitutional violations resulting from the plaintiff's disorderly conduct arrest in 2005.  Pl.'s Opp. at 3–6.

- The fact that the D.C. Court of Appeals narrowly construed the disorderly conduct statute in June 2010 to avoid the risk that it would encompass innocent behavior.  *Id.* at 10, citing *In re T.L.*, 996 A.2d 805, 814 (D.C. 2010).

- The D.C. Council's decision to revise the disorderly conduct statute in 2011, which included making the provision that prohibited "loud and boisterous" behavior inapplicable when that speech was directed at police officers.  *Id.* at 11; *see also Revising the District of Columbia Disorderly Conduct Statutes:   A Report and Proposed Legislation*, The Disorderly Conduct Arrest Project Subcommittee (Oct. 14, 2010) ("2010 Disorderly Conduct Report"), Ex. 5 to Pl.'s Opp. [Dkt. # 30-5].  Plaintiff also attached an article about the D.C. Council's revision of the disorderly conduct statute as an exhibit to his opposition brief.  *See The District Council Passes a Revised Disorderly Conduct Law*,

Office of Police Complaints (Feb. 25, 2011) ("OPC Article"), Ex. 6 to Pl.'s Opp. [Dkt. # 30-6].

- The fact that the District's disorderly conduct arrest rate was significantly higher than the nationwide rate, "ranging from two to four times the nationwide rate during the period from 1996 to 2000," Pl.'s Opp. at 4, and that in 2009, there were approximately 5,338 arrests for disorderly conduct in the District. *Id.* at 11.

- A report published in July 2013 that concluded that eight out of ten individuals arrested between 2009 and 2011 in the District are African-American or Hispanic males. *Id.* at 11–12; *see also Racial Disparities in Arrests in the District of Columbia, 2009–2011: Implications for Civil Rights & Criminal Justice in the Nation's Capital*, Washington Lawyers' Committee (July 2013), Ex. 4 to Pl.'s Opp. [Dkt. # 30-4].

But none of that evidence demonstrates that at the time of plaintiff's arrest in 2009, the District had a custom of arresting individuals for disorderly conduct in a way that violated the First and Fourth Amendments. First, the 2013 report has no relevance in this case. Although it analyzes data related to disorderly conduct arrests from 2009 to 2011, the report is tailored toward exposing racial disparities – an issue not raised in the complaint – not violations of an individual's free speech rights or the right to be free from an unlawful seizure. *See Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133–34 (D.D.C. 2011) (finding no policy or custom for arresting without probable cause because "the Plaintiff was not arrested for the offense examined in the report on which he relie[d]" to show custom).

Second, the 2003 CCRB report and the 1996 to 2000 statistics indicating that the District had a significantly higher disorderly conduct arrest rate than the rest of the nation during that time period do not show that the District had a custom of violating the constitutional rights implicated by the complaint at the time of plaintiff's arrest in 2009. The 2003 report was based on data from at least six years earlier, and the statistics plaintiff cites are based on data from at least nine years earlier. *See Hunter*, 824 F. Supp. 2d at 133 (citation omitted) ("One study, seven

years prior to Plaintiff's arrest, does not show a 'persistent, pervasive practice . . . .'"); *see also Dormu*, 795 F. Supp. 2d at 25.

Third, plaintiff's reliance on *Huthnance* is misplaced for the same reason. The plaintiff in that case was arrested in 2005, or approximately four years before this plaintiff's arrest. 793 F. Supp. 2d at 187. Moreover, the plaintiff in *Huthnance* offered a significant amount of evidence in addition to the 2003 report, including data related to the year of her arrest. *Id.* at 200–03. Thus, even if the Court were to take judicial notice of the evidence and the court's findings in *Huthnance*, that information would not satisfy plaintiff's burden to show what was customary in the District in 2009. *See Page*, 999 F. Supp. 2d at 285 ("Even if the Court were to take judicial notice of [prior] cases, the strip search policy being addressed was one that existed at least seven years prior to the events that are the subject of [the plaintiff's] complaint, and the instant complaint does not allege facts that suggest that the District persisted in its unconstitutional actions . . . .").

Fourth, plaintiff's statement that there were approximately 5,338 arrests for disorderly conduct in 2009 – without more – does not demonstrate a custom of constitutional violations. Plaintiff takes no steps to demonstrate how many of those arrests raised constitutional concerns, such as suppressing free speech or arresting without probable cause, and the Court will not simply assume that the recorded arrests were improper. *See Hunter*, 824 F. Supp. 2d at 133 (noting that the plaintiff did not provide "even a study indicating a substantial portion of misdemeanor arrests in the District in 2007 lacked probable cause").

And finally, the D.C. Court of Appeals decision in 2010 and the D.C. Council's revision of the disorderly conduct statute in 2011 do not support a conclusion that the District had a custom of violating constitutional rights under the auspices of the previous disorderly conduct

statute. The fact that a court interprets a statute to avoid constitutional implications does not automatically mean that constitutional violations are widespread. Moreover, the contents of the 2010 Disorderly Conduct Report do not indicate that the D.C. Council's revisions to that statute were prompted by widespread violations of constitutional rights: "Although the MPD subsequently changed its training and procedures in ways that have substantially reduced the number of arrests for disorderly conduct, it is desirable to revise and consolidate the statutes to more clearly define – for the benefit of the police and the citizenry – what conduct is prohibited." 2010 Disorderly Conduct Report at 3. Plaintiff has therefore failed to carry his burden to establish municipal liability under the theory that the District had a custom or practice of making unconstitutional disorderly conduct arrests in 2009.

Plaintiff has also failed to provide the Court evidence from which a reasonable juror could conclude that the District was deliberately indifferent to the risk that its citizens would be deprived of their constitutional rights on a theory that it failed to train, supervise, or discipline its officers. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 131 S. Ct. at 1360 (alteration in original), quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997) (internal quotation marks omitted); *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996) ("*Proving* a failure-to-train claim is no easy task."). As a result, a plaintiff seeking to establish municipal liability under this theory must demonstrate the three elements of notice, inaction, and causation. He must show not only that the local government either knew or should have known about the risk of constitutional violations (notice), but also that it consciously chose to not take measures to reduce that risk (inaction). *See Warren*, 353 F.3d at 39, quoting *Baker*, 326 F.3d at 1306 (noting that deliberate indifference "'is determined

by analyzing whether the municipality knew or should have known of the risk of constitutional violations,' but did not act").  And he must show that the failure to act is closely related to the alleged constitutional injury (causation).  *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986), quoting *Monell*, 436 U.S. at 694 ("[T]he plaintiff must establish that the official policy or custom itself is 'the moving force of the constitutional violation.'").  *See also City of Canton*, 489 U.S. at 391 ("[F]or liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.").

Both the Supreme Court and the D.C. Circuit have previously "held that a city's . . . failure to train or supervise its employees adequately" may constitute deliberate indifference under *Monell*.  *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000); *see also City of Canton*, 489 U.S. at 388 ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.").  But the Supreme Court has also recognized that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick*, 131 S. Ct. at 1359; *see also City of Canton*, 489 U.S. at 388–89 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality" does the failure evidence "a 'deliberate indifference' to the rights of its inhabitants" that can "be properly thought of as a city 'policy or custom' that is actionable under § 1983"); *Daskalea*, 227 F.3d at 441; *Dorman v. District of Columbia*, 888 F.2d 159, 162 (D.C. Cir. 1989) (noting that the *City of Canton* "Court adopted a high degree of fault and causation for cases" based on a theory of deliberate indifference).  The Court must apply an objective standard, *Baker*, 326 F.3d at 1307; "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes

of failure to train," *Connick*, 131 S. Ct. at 1360 (internal quotation marks omitted) (rejecting a deliberate indifference theory because there was no evidence of a pattern of similar constitutional violations), and "the need for more or different training" must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390; *see also Atchinson*, 73 F.3d at 421.

Here, plaintiff points to the same "evidence" in support of the deliberate indifference theory that he relied upon to support his theory of custom or practice. But that material is inadequate to support municipal liability on the deliberate indifference theory for similar reasons.

The Court finds that the 2003 report and the various lawsuits filed against the District put the municipality on notice of the potential for constitutional violations linked to disorderly conduct arrests. *See Daskalea*, 227 F.3d at 441 (finding that the District had notice of the alleged constitutional violation because seven months prior to the alleged constitutional violation, the District had been found liable in a federal district court "under section 1983 for being deliberately indifferent to the repeated sexual abuse and harassment of women prisoners by D.C. correctional officers" and that "[g]iven this history, the District and its policymakers were on notice that D.C. guards lacked basic respect for the rights of female inmates, and that absent substantial intervention, the pattern of unconstitutional behavior would persist"). *But see Dormu*, 795 F. Supp. 2d at 26 ("While it could be inferred that the 2003 report put the District on notice of a practice of improper disorderly conduct arrests by the MPD, the Court cannot assume that the District continued to be on notice four years later when [the plaintiff] was arrested."). Thus, the first requirement to show deliberate indifference – that the District knew or should have known about the pattern of constitutional violations – is satisfied here. But while the

remaining requirements – inaction and causation – might be alleged in plaintiff's filings, they have not been supported by competent evidence, which is fatal at the summary judgment phase. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B).

Plaintiff cannot rely on *Huthnance*, the 2003 report, the 1996 to 2000 statistics, the number of disorderly conduct arrests in 2009, or the 2013 report because all of them fail to satisfy plaintiff's burden at this stage for the same reasons articulated above. Moreover, plaintiff's other exhibits tend to support the conclusion that the District did not remain deliberately indifferent toward the risk of constitutional violations. First, the 2010 Disorderly Conduct Report recognized that MPD had "changed its training and procedures in ways that have substantially reduced the number of arrests for disorderly conduct." 2010 Disorderly Conduct Report at 3. Second, the article attached as exhibit 6 to plaintiff's opposition states that the "task force" that generated the report and pushed for the statute's revision included "participants from the Metropolitan Police Department." OPC Article. And third, plaintiff concedes that at some point, the District started to require all MPD "officers to complete and pass an online training course before making or approving a disorderly conduct arrest." *Id.*; Pl.'s Opp. at 11. He does not challenge that training as inadequate or argue that it was only implemented after plaintiff's arrest in 2009.[4] *See* Pl.'s Opp. And although plaintiff does allege that Officer Jimenez did not complete that training until 2013, *id.* at 20, citing Jimenez Dep., the fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." *City*

---

[4]     This fact distinguishes this case from cases like *Daskalea v. District of Columbia*, where the District was found to be deliberately indifferent because "[t]here was no evidence that a training program or any other corrective measure was implemented" in the wake of the District's receipt of notice regarding the mistreatment of female prisoners. 227 F.3d at 442; *see also Dorman*, 888 F.2d at 164, quoting *City of Canton*, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part) (noting that "'it could be shown that the need for training was obvious' when a municipality failed 'to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face'").

*of Canton*, 489 U.S. at 390; *see also Atchinson*, 73 F.3d at 421 ("[A] plaintiff cannot prevail simply by showing that a single officer was inadequately trained.").

Taken together, these exhibits do little to meet plaintiff's burden to establish the city's deliberate indifference or inaction at the critical point in time of question:  plaintiff's arrest.  *See Dormu*, 795 F. Supp. 2d at 25–26 ("No reasonable juror could conclude that a policy that supposedly existed in 2003 caused the deprivation of [the plaintiff's] rights in 2007.").  At this stage in the case, plaintiff – as the nonmoving party – bears the burden to come forward with competent evidence that would create a genuine issue of material fact in order to survive summary judgment.  *Atchinson*, 73 F.3d at 422 (noting that although the plaintiff sufficiently alleged a municipal policy to survive a motion to dismiss, the plaintiff would "need to *prove* more about the District's police training" than what he asserted in the complaint "to prevail on the merits"); *see also Dormu*, 795 F. Supp. 2d at 25–26.  Plaintiff has not satisfied that burden.[5]

---

5       In his opposition brief, plaintiff argues that the allegations in his complaint are sufficient to state a claim against the District under *Monell*.  *See, e.g.*, Pl.'s Opp. at 14–15.  But that contention mistakes the posture of the case.  Summary judgment does not test the sufficiency of the allegations; it requires the nonmoving party to come forward with evidence that there is a genuine issue of material fact.  *Dormu*, 795 F. Supp. 2d at 26 ("To survive summary judgment, [a plaintiff] cannot rely on mere allegations; he must provide competent evidence."); *see also Atchinson*, 73 F.3d at 422.  As a result, plaintiff's reliance on the allegations in his complaint and his citation to the opinion of another court in this district that addressed this issue on a motion to dismiss, *see Amons v. District of Columbia*, 231 F. Supp. 2d 109 (D.D.C. 2002), are misplaced.

The Court will therefore grant the District's motion for summary judgment with respect to Count Four.[6]

## II. Officer Jimenez is entitled to summary judgment on Count One to the extent that it is predicated on a theory that the officer used excessive force when arresting plaintiff.

In Count One of the complaint, plaintiff asserts a section 1983 claim against Officer Jimenez that is predicated on alleged violations of plaintiff's Fourth Amendment rights on the night of his arrest. Compl. ¶¶ 51–76. Defendants have moved for summary judgment on that count but only to the extent that it asserts that Officer Jimenez used excessive force in violation of the Constitution. Defs.' Mem. at 15–19. They argue that even accepting plaintiff's version of the facts, the alleged force was reasonable under the circumstances, and Officer Jimenez is therefore entitled to qualified immunity. *Id.*

Plaintiff does not address defendants' excessive force argument in his opposition. Instead, he spends that portion of his brief arguing that there is a question of fact on whether or not the officers had probable cause to arrest plaintiff that night, which he claims precludes summary judgment at this time. Pl.'s Opp. at 15–18. Based on that ground alone, the Court could treat defendants' motion for summary judgment on the excessive force claim in Count One as conceded. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd* 2004 WL 11178772 (D.C. Cir. 2004); *see also Lewis v. District of*

---

6       In his opposition brief, plaintiff argues that the Court should deny the motion for summary judgment on Count Four because the motion, as originally filed, misstated the counts on which the District sought judgment. *See* Pl.'s Opp. at 7 n.1. He argues that the defendants did not file a supplement correcting the misstatement until two business days before his opposition was due, which "grossly prejudice[d] Plaintiff," and that the Court should require defendants to file a new motion if they intend to pursue judgment on Count Four. *Id.* But plaintiff provided the Court with no indication of how the supplemental filing prejudiced him, plaintiff did not seek additional time to file his opposition at the time, and he does not cite any authority for the relief he requests. Moreover, plaintiff provided a thorough response in opposition to defendants' motion on Count Four.

*Columbia*, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. 2011).  But even if plaintiff had opposed defendants' position that the alleged force in this case was within the limits of the Constitution, Officer Jimenez would still be entitled to summary judgment on plaintiff's excessive force claim.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).  The defendant bears the burden of pleading and proving the defense of qualified immunity, *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982), and in each case, the court may decide which prong to address first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Here, defendants focused their arguments on demonstrating why, even accepting plaintiff's version of the facts as true, the force allegedly employed by Officer Jimenez was not excessive.  Defs.' Mem. at 15–19.

It is well-settled that "[p]olice officers will not be found to have used excessive force in violation of the Fourth Amendment if their actions were 'objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  *DeGraff v. District of Columbia*, 120 F.3d 298, 301 (D.C. Cir. 1997), quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998) (explaining that "[a]n officer will only be held liable" for use of excessive force "if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions").  The "'[t]est of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,'" *Graham*, 490 U.S. at 396, quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), but it must instead be applied with

"careful attention to the facts and circumstances of each particular case." *Id.*; *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011). Although "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," *Graham*, 490 U.S. at 396 (internal quotation marks omitted), "'a police officer must have some justification for the quantum of force he uses.'" *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012), quoting *Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008). And whether that justification is reasonable must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Moreover, the Supreme Court has cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396–97. And the D.C. Circuit has explained that in cases like this one:

> [A] defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions.

*DeGraff*, 120 F.3d at 302, quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993); *see also Oberwetter*, 639 F.3d at 555.

Applying that binding precedent here, the Court cannot find that a reasonable juror could conclude that Officer Jimenez's conduct was so excessive that no reasonable officer could have believed that it was lawful. Plaintiff alleges that the officers were physical with him on two instances the night of his arrest. First, he alleges that after he had entered the store and the

officers approached him and started to yell at him, the officers grabbed his arm, spun him around and pushed or pulled him outside of the convenience store. Egudu Dep. 18:15–19:2, 20:21–21:9, 23:5–14; *see also* Defs.' SOF ¶ 4. And second, he alleges that once they were outside, Officer Jimenez "slammed" plaintiff's body onto the hood of the police cruiser and began to "rough him up." Egudu Dep. 24:17–22; *see also* Defs.' SOF ¶ 5. The officers then handcuffed and searched plaintiff. Egudu Dep. 25:1–5; *see also* Defs.' SOF ¶ 5.

During the entire interaction with the officers, plaintiff asserts that he made no sudden movements, that he tried to diffuse the situation by telling the officers that they could arrest him if he had done anything wrong, and that he even placed his hands behind his back so that the handcuffs could be applied. Egudu Dep. 19:4–12, 20:16–25:8. Plaintiff also states that while Officer Jimenez "roughed him up" on the hood of the police cruiser, he did not say anything to the officers. *Id.* 25:6–8.

Plaintiff contends that, as a result of the force Officer Jimenez applied, he suffered an injury to his head and torso. *Id.* 28:7–19. But when pressed to elaborate, plaintiff acknowledged that he had no external signs of injury, that he did not seek medical treatment, and that he managed any lingering pain with over-the-counter medication. *Id.* 28:7–29:12, 43:14–44:9.

As noted above, there is a genuine dispute of fact regarding plaintiff's behavior on the night of his arrest, *see, e.g.*, Jimenez Dep.; Egudu Dep., and the resolution of that dispute might bear on the level of force that was necessary to subdue him. But although the dispute is genuine, the existence of that dispute is not sufficient in and of itself to preclude summary judgment in this case because the disputed facts are not material to the issue that would lead to the entry of judgment for the defendants. In other words, even if the Court were to credit plaintiff's version

of the incident, and he was polite and compliant as he maintains, the force he describes was not

so excessive that no reasonable officer could have found it to be lawful under the circumstances.

It would certainly be troubling if a police officer used more force than was necessary to

effect an arrest of an individual who voluntarily offered his wrists to the officer twice. But the

Court's legal analysis is constrained by the Supreme Court's statement regarding the use of force

in the context of an arrest: "Our Fourth Amendment jurisprudence has long recognized that the

right to make an arrest or investigatory stop necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396; *see also*

*Oberwetter*, 639 F.3d at 555, quoting *Graham*, 490 U.S. at 396 ("In general, police officers have

authority to use 'some degree of physical coercion' when subduing a suspect as long as the

amount of force used is reasonable."). As a result, the starting point in the Court's analysis

requires it to recognize that, simply because the officer was arresting plaintiff, *some* modicum of

force is permitted under the law. This fact distinguishes plaintiff's case from other cases where

courts found summary judgment improper because the application of force at issue in those cases

was not in furtherance of an arrest. *See, e.g.*, *DeGraff*, 120 F.3d at 302 (noting that the plaintiff

was handcuffed at the time she was lifted off the ground and that the record was devoid of "clues

as to why [the officers] felt it necessary" to use that force).

Next, the type of force that plaintiff alleges – the grabbing of his arm and pushing him up

and down on the hood of the police cruiser – is "not markedly different from what we would

expect in the course of a routine arrest," which supports the conclusion that it was reasonable,

particularly in the absence of any injuries requiring treatment. *Oberwetter*, 639 F.3d at 555; *see*

*also Robinson v. District of Columbia*, No. 03-1455, 2006 WL 2714913, at *4 (D.D.C. Sept. 22,

2006) (finding no excessive force where an "arresting officer pushed plaintiff and shoved him

onto the hood of his car, and held plaintiff down while putting the handcuffs on plaintiff's wrists," even though "[n]othing in the record suggest[ed] that plaintiff resisted arrest, posed a threat to the officers' safety or to the safety of any bystanders, or attempted to flee the scene"); *Gee v. District of Columbia*, No. 04-1797, 2005 WL 3276272, at *3 (D.D.C. Aug. 22, 2005) (finding no excessive force where the officer took the plaintiff's "arm, and twisted it behind [his] back while [another officer] took his hand and forcible [sic] bent [his] neck forward causing [him] to sustain the injuries"). It is also a far cry from the types of force previously found excessive in this Circuit. *See, e.g.*, *Rudder*, 666 F.3d at 795, quoting *Oberwetter*, 639 F.3d at 555 ("Unlike, say, pushing an arrestee against a wall and pulling his arm behind his back, beating a suspect to the ground with a baton exceeds in violence anything 'we would expect in the course of a routine arrest.'"); *Johnson*, 528 F.3d at 975 (recognizing that although apprehending a suspect is a weighty government interest, kicking a suspect who was laying on the ground in the groin was unlikely to have furthered it).

Moreover, plaintiff's lack of serious or lasting injury cuts against a conclusion that the force used against him to effect his arrest was excessive or unreasonable. As another court in this district explained in a different case, "[t]his is not a situation where an arrestee was beaten, shot, or permanently injured as a result of the arresting officers' use of force. Rather, the record shows that the amount of force used [was] enough to effect the arrest without causing plaintiff undue physical harm or lasting injury." *Robinson*, 2006 WL 2714913, at *4 (citations omitted); *see also Oberwetter*, 639 F.3d at 555; *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009); *James v. United States*, 709 F. Supp. 257, 261 (D.D.C. 1989). And in this Circuit, a lack of "any serious bodily injury tends to confirm that the use of force was not excessive." *Oberwetter*, 639 F.3d at 555. Thus, plaintiff's lack of serious injury, *see* Egudu Dep. 28:7–

29:12, 43:14–44:9, coupled with the fact that the alleged force occurred during the course of his arrest, leads the Court to conclude that no reasonable juror would find that Officer Jimenez's alleged conduct was so excessive that no reasonable officer could have believed in the lawfulness of his actions. Defendants are therefore entitled to summary judgment on Count One to the extent that it asserts a section 1983 excessive force claim against Officer Jimenez.

## III. The Court will dismiss Counts Nine, Ten, and Eleven because plaintiff did not satisfy the jurisdictional notice requirement.

Counts Nine, Ten, and Eleven of the complaint state claims for negligent hiring, negligent training and supervision, and negligent retention, respectively, against the District. Compl. ¶¶ 191–225. Each count is predicated on the injuries that plaintiff allegedly suffered as a result of his encounter with Officer Jimenez and Officer Marshall in 2009. *Id.*

Defendants moved for summary judgment on all three counts, arguing that plaintiff did not satisfy the notice requirement in D.C. Code § 12-309. Plaintiff acknowledges that the letter his attorney sent to Mayor Vincent Gray and Metropolitan Police Department Chief Cathy Lanier was sent more than six months after his alleged injuries and therefore does not satisfy that prerequisite. Pl.'s SOF ¶ 6; *see also* Letter on behalf of Pl. to Mayor Vincent Gray & Chief Cathy Lanier (Aug. 13, 2012), Ex. 2 to Defs.' Mot. at 10 [Dkt. # 26-2]. But he contends that the notice requirement was met instead by the police report that Officer Jimenez filled out about plaintiff's arrest. Pl.'s SOF ¶ 6; *see also* Pl.'s Opp. at 18–20.

"Since Section 12-309 is in derogation of the common law, it is to be strictly construed," and "compliance with the statutory notice requirement is mandatory." *Pitts v. District of Columbia*, 391 A.2d 803, 807 (D.C. 1978) (internal quotation marks omitted). Unless a plaintiff "'demonstrates compliance with the requirements of § 12-309,'" the "'suit against the District is properly dismissed.'" *Snowder v. District of Columbia*, 949 A.2d 590, 600 (D.C. 2008), quoting

*District of Columbia v. Arnold & Porter*, 756 A.2d 427, 436 (D.C. 2000); *see also Sperling ex rel. Estate of Oxlaj-Gonzales v. Wash. Metro. Area Transit Auth.*, 542 F. Supp. 2d 76, 81 (D.D.C. 2008) (noting that "[s]ection 12-309 would operate as a jurisdictional bar . . . if notice is found insufficient"). Section 12-309 of the D.C. Code provides:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

D.C. Code § 12-309.

The statute provides that the notice requirement may be satisfied by a police report that was written in the regular course of an officer's duty. But the D.C. Court of Appeals has made clear that "the existence of a police report does not necessarily mean that the District has received the type of actual notice which § 12-309 contemplates." *Allen v. District of Columbia*, 533 A.2d 1259, 1262 (D.C. 1987); *see also Martin v. District of Columbia*, 720 F. Supp. 2d 19, 25 (D.D.C. 2010). "[I]f a police report is the means by which the District is to be notified, then '[i]n order to protect the District against unreasonable claims, the actual notice provided by [the] police report must contain information as to time, place, cause and circumstances of injury or damage with at least the same degree of specificity required of a written notice.'" *Allen*, 533 A.2d at 1262 (alterations in original), quoting *Miller v. Spencer*, 330 A.2d 250, 251 (D.C. 1974). "'[A] police report must do more than merely report the happening of an event or accident; it must also report – give notice of – any then apparent injury . . . which later forms the basis of a claim.'" *Id.* at 1263, quoting *Miller*, 330 A.2d at 252.

A report contains information relating to the "cause" of the injury if it "'recite[s] facts from which it could be reasonably anticipated that a claim against the District might arise.'" *Id.* at 1262, quoting *Pitts*, 391 A.2d at 809. This requires that the report "disclose both the factual cause of the injury and a reasonable basis for anticipating legal action as a consequence." *Washington v. District of Columbia*, 429 A.2d 1362, 1366 (D.C. 1981) (en banc). A report may satisfy that requirement "if it either characterized the injury and asserted the right to recovery, or without asserting a claim described the injuring event with sufficient detail to reveal, in itself, a basis for the District's potential liability." *Id.*

The report must also "include details of the 'circumstances' surrounding the injury." *Allen*, 533 A.2d at 1262. And the details must describe those circumstances with "enough specificity to allow 'the District to conduct a prompt, properly focused investigation of the claim.'" *Id.*, quoting *Washington*, 429 A.2d at 1366.

Finally, the D.C. Court of Appeals has instructed that, although a police report may satisfy the requirements of section 12-309, an *arrest* report "is presumptively devoid of any notice of a potential claim of injury or damage from false arrest, assault and battery, or negligence," and it does not "automatically supply the requisite information regarding 'time, place, cause, and circumstances of the injury or damage.'" *Id.* at 1262–63, quoting *Jenkins v. District of Columbia*, 379 A.2d 1177, 1178 (D.C. 1977); *see also Martin*, 720 F. Supp. 2d at 25; *Pitts*, 391 A.2d at 808.

Applying that framework to this case, the Court finds that the arrest report filled out by Officer Jimenez did not provide notice to the District of plaintiff's negligent hiring, training and supervision, and retention claims for purposes of section 12-309. The report states:

> I, Officer Jimenez, and Officer Marshall were in full uniform in a marked
> squad car, operating as call sign full stride 308, in PSA 308

We pulled up to 7th and Rhode Island Ave to the 7 Eleven, when we were met by D-1. D-1 approached the vehicle and said "Who the f*** do you think you are." D-1 was very loud and continued to yell at the squad car. D-1 then continued to yell as he entered the location. I approached D-1 and asked him, "What was the problem." D-1's response was "F*** you, you idiot. You IQ is an negative one." I then asked D-1 to "leave the premises." I asked D-1 for his identification, his response was "I do not have anything for you guys." Once outside D-1 continued to yell in a very loud and boisterous voice, bringing attention to himself, "F*** you all are afraid of me." At this time I then asked D-1 "to leave the premise" again. Outside there was a large crowd forming. I then informed D-1 that he was currently "breaching the peace." D-1's response to my order to leave the premises again was "F*** you, I can do whatever I want to." He came toward me in an aggressive manner saying, "F*** you stupid incompetent police," with his fist balled up in a menacing manner.

D-1 was then placed under arrest for Disorderly (Loud and Boisterous).

D-1, identified on the 3D station as, Egudu, Ike, was transported to 3D for processing.

Police Report, Ex. 3 to Pl.'s Opp. at 3 [Dkt. # 30-3].

Plaintiff's arrest report does not satisfy the notice requirement. The report does not explicitly state or implicitly suggest that plaintiff suffered an injury as a result of his encounter with the officers or from his subsequent arrest. It merely recites the officer's version of escalating events that culminated in plaintiff's arrest for disorderly conduct. *See id.* This alone is fatal to plaintiff's claim that the report satisfied the jurisdictional notice requirement in section 12-309. *See Martin*, 720 F. Supp. 2d at 25 ("In this case, the police report suggests a lawful arrest of plaintiff, and contains no reference to any assault or injury of plaintiff."); *Sperling*, 542 F. Supp. 2d at 82 ("Because the facts included in the Police Report do not suggest that the District would be the likely target of a claim by the Plaintiff, the Court agrees with the District that the Police Report, *standing alone*, does not provide adequate notice pursuant to Section 12-309."); *see also Snowder*, 949 A.2d at 601 ("[T]he reports do not establish a reasonable basis for

anticipating legal action: informing the District that a car was stolen does not warn the District that the owner might sue the District if it later recovers that vehicle and then impounds it without proper notice.").

Plaintiff challenges that conclusion, arguing that "strict compliance" with section 12-309 "is not required" and that the Court should "resolve any doubts in his favor and permit all surviving common law claims against Defendants to be sustained." Pl.'s Opp. at 19. But although the D.C. Court of Appeals "has noted 'with respect to [t]he details of the statement (giving notice), [p]recise exactness is not absolutely essential,'" *Pitts*, 391 A.2d at 807, quoting *Hurd v. District of Columbia*, 106 A.2d 702, 705 (D.C. 1954), and therefore in close cases that courts should resolve doubts with respect to the content of the notice "in favor of finding compliance with the statute," *Wharton v. District of Columbia*, 666 A.2d 1227, 1230 (D.C. 1995); *see also Plater v. D.C. Dep't of Transp.*, 530 F. Supp. 2d 101, 107 (D.D.C. 2008), this is not a close case. The police report here gives no indication that plaintiff suffered an injury as a result of the events that occurred the night of his arrest, and it does not present any facts that would "indicate a basis for potential liability over and above that which exists in many law enforcement operations." *Allen*, 533 A.2d at 1263. Plaintiff therefore did not satisfy the jurisdictional notice requirement set forth in D.C. Code § 12-309, which means that the Court must dismiss Counts Nine, Ten, and Eleven.

**CONCLUSION**

For the reasons stated above, the Court finds that defendants are entitled to summary judgment on Count Four as well as plaintiff's excessive force claim in Count One. The Court also finds that plaintiff failed to satisfy the jurisdictional notice requirement that is a condition precedent to plaintiff's claims in Counts Nine, Ten, and Eleven, so those counts must be dismissed. The Court will therefore grant defendants' partial motion for summary judgment. A separate order will issue.


_____
AMY BERMAN JACKSON
United States District Judge

DATE: October 29, 2014